[Civ. No. 3070.   Fourth Dist.   Apr. 23, 1943.]

CALIFORNIA COTTON COOPERATIVE ASSOCIATION LTD. (a Corporation), Appellant, v. J. C. BYRNE, Respondent.

Harvey, Johnston & Baker for Appellant.

Lawrence W. Young for Respondent.

GRIFFIN, J.—This is an action to recover $4,573.31. The complaint contains six separate causes of action. The last five of these were based on accounts stated. The first cause of action was based on a course of conduct between appellant and respondent in connection with contracts of sale between them covering sales of several lots of cotton aggregating about 1,600 bales, out of which course of conduct appellant claims in the last five causes of action that there arose accounts stated. The respondent's answer contains denials as to all of appellant's causes of action. The issues went to trial before the court without a jury and resulted in a judgment in favor of defendant and respondent. From this judgment appellant has taken this appeal.

The trial court found generally that in September, 1940, the appellant and respondent entered into an oral agreement under the terms of which they agreed, during the cotton season of 1940-1941, that the respondent would sell to appellant strict middling $1\frac{1}{8}$ inch cotton for 10c per pound and

bright middling 1⅛ inch cotton for 9.85c per pound, and that the grade and staple of the cotton agreed to be sold could vary between strict middling 1⅛ inch to bright middling 1⅛ inch; that respondent delivered to appellant 2,603 bales of cotton ranging from strict middling 1⅛ inch to bright middling 1⅛ inch, and that appellant accepted 1,007 bales thereof; that after the agreement was entered into the market price of strict middling 1⅛ inch cotton and bright middling 1⅛ inch cotton dropped considerably below the contract price and that by reason of the dropping of the market price the appellant arbitrarily rejected 1,596 bales of the cotton delivered to it. The court then found that the appellant had not suffered any damages as a result of any act of the respondent and that there were no accounts stated between them.

Appellant contends, mainly, that there is no substantial evidence justifying the finding of the trial court. It is argued that there was no substantial evidence to show that there was any drop in the market or that the rejection of the cotton by appellant was arbitrary. The evidence does show that respondent had been engaged in the business of buying and selling cotton for over thirty years and was an experienced judge of the quality and staple of cotton. It was orally agreed that respondent would sell cotton to the appellant at the price set forth in the findings. Appellant company, under the agreement, was to grade, in accordance with the custom, the cotton so sold, for the purpose of fixing the price to be paid by it. The method of measuring the length of the cotton which was pulled from each side of the bale was not by any measuring device but by running the cotton through the classifier's fingers to determine its length. It was testified that this was the customary method used and that classifiers become so expert they can tell its exact length in this manner. Many bales were rejected by appellant because it was claimed by it that the length of the cotton was 1/32 of an inch off of the specifications called for in the contract.

On October 1, 1940, respondent started to fulfill his contract and the cotton was delivered to appellant in various lots. Upon its receipt, appellant classified each bale of cotton as to staple and grade, and as the season progressed there were increasing rejections by the appellant. On October 1, 1940, respondent delivered to appellant 150 bales of cotton and there were no rejections. On October 10, he delivered

200 bales and there were 74 rejections. On October 15, out of 300 bales delivered 109 were rejected. On October 18, out of 400 bales 190 were rejected. On October 22, out of 282 bales 178 were rejected. On October 23, he delivered 422 bales and there were 267 rejections. On November 6th and 7th, out of 399 bales delivered there were 319 rejections. In the latter part of October, 1940, the "spot price" of cotton broke or went down. The evidence discloses that it would take from ten days to three weeks or longer from the date of the sale to deliver the cotton to appellant. Appellant would then send to respondent its notice of rejection of the cotton approximately 60 days after it was delivered. Respondent was paid by appellant as the cotton was shipped to it upon the basis that it was all according to the classification set forth in the agreement. It was apparently understood that if any of the cotton fell short of that classification respondent was to be billed by appellant for the rejected bales. This action was based upon that claim.

Respondent testified that he was an experienced classifier and that before shipment he examined and classified, in the customary manner, each bale of cotton he had shipped to appellant, and it was all cotton ranging from strict middling $1\frac{1}{8}$ inch to bright middling $1\frac{1}{8}$ inch, and that all of it was well within the specifications required by the agreement.

The trial court apparently accepted respondent's testimony in this respect because it found that nothing was due appellant because of the claimed rejected cotton.

Appellant's classifiers testified that the rejections above listed were proper. They also offered in evidence records of classification of this same cotton, made at the gin by the United States government classifiers. Their record shows that about 1020 bales of the cotton delivered to appellant failed to meet the specifications of grade set forth in the contract and in many cases the grading given by the government was much less than or was different from that given by appellant's classifiers. It is appellant's contention that respondent's evidence of arbitrary grading by appellant is so unsubstantial that it does not even create a conflict in the evidence on the question; that under the agreement the classification given the cotton by appellant was intended to be final and that respondent failed to prove by substantial evidence that appellant acted arbitrarily in rejecting the cotton or perpetrated any fraud upon him.

Bearing upon the question whether there was evidence to show that in October there was a price drop in the cotton market, we find this evidence. Appellant's manager, on cross-examination, testified that at about that time strict middling 1⅛ inch cotton was purchased by his company at 9.90 and at 9.70, 30 points off. In a letter to respondent dated November 14, 1940, signed by appellant's manager, in addition to registering a complaint as to the grade of the cotton shipped to it by respondent, it is remarked: "Ours is a hedging position and we are aware of the fact basis has broken in the last 40 to 50 pounds advance in the market." In response to the question: "When the market started to break, Mr. Byrne, did you receive more rejections on this cotton?" Mr. Byrne answered: "I received more as the market broke further and further." Appellant claims that if the trial court had accepted the government reports and cotton exchange reports in evidence it could not have found that there was any drop in price of the particular grade of cotton here involved over the period in question. The evidence, though conflicting, supports the trial court's finding in this respect and will not be disturbed on this appeal.

The amount of rejections at or about the time of the fall in price and subsequent thereto, compared to the previous number of rejections, is a circumstance to be considered together with the testimony of respondent in connection therewith. If we assume the testimony of respondent to be true, which we must do on this appeal, i. e., that he inspected and classified all of the cotton shipped, and that the grade and staple was according to the contract, it would be reasonable to believe that the increasing amount of rejections immediately after the fall in price was the result of an arbitrary grading. Although the evidence might also reasonably support a contrary view, we cannot say that it is insufficient to support the finding.

It is next contended that since respondent was notified of the number of rejections by appellant and accepted those rejections as "his cotton," he is now estopped from raising any question respecting those rejections. The evidence shows that some of the rejected cotton was sold by respondent after being rejected by appellant. Respondent claims that he sold that cotton, not for himself, but for and on behalf of appellant. The evidence is conflicting in this respect. Assuming the truth of respondent's testimony, under these circumstances, it could not be said that he waived any right to claim

palpable arbitrary rejection on the part of appellant. ■ The rule is well settled that it is the duty of one who knows he is threatened with damage to do all he reasonably can do to minimize his damage. (*Vitagraph, Inc.* v. *Liberty Theatres Co.*, 197 Cal. 694, 697 [242 P. 709] ; Civ. Code. sec. 3354.)

■ The first cause of action included certain items such as claimed advance storage charges, insurance and storage charges on rejected cotton, and interest on unpaid balances. One item of $53.80 involved a bale of cotton claimed to have been lost in delivery by a common carrier. A question arose as to whether appellant or respondent should have made a claim for it. The trial court was justified in believing that appellant's failure to make the claim for it was its loss rather than that of respondent. The record contains several hundred pages of exhibits setting forth certain claims and transactions between the parties to this action. The testimony is not clear as to the exact terms of the oral agreement between them. It is difficult to determine therefrom whether the claimed insurance charges and items of storage and interest are predicated on the theory that certain bales of cotton, after rejection, became the property of appellant or of respondent. In view of the finding that the cotton was arbitrarily rejected by appellant, such cotton as was so arbitrarily rejected at no time after coming into the possession of appellant became the property of respondent. It therefore was not subject to any claim of expense against respondent if it was so improperly rejected.

■ Appellant's claimed account stated is based principally upon the theory that appellant forwarded to respondent notice of rejection, together with statements covering his account with the company, and that he failed to object thereto; that as a result thereof, an account stated arose in the amount claimed.

If we accept respondent's theory and the court's finding that all of the cotton was arbitrarily rejected, by such wrongful act the relation of debtor and creditor did not arise. The theory upon which an action for an account stated is allowed is that transactions have occurred between the parties from which the relation of debtor and creditor has arisen and that thereafter one or both have rendered or made statements or declarations specifying definitely the amount due on account thereof and thereupon there has been an agreement, express or implied, by the one who is the debtor to the other that a

certain sum is due him on such account, together with an express or implied promise to pay the same. (*Bennett* v. *Potter,* 180 Cal. 736, 745 [183 P. 156]; *Stimson Mill Co.* v. *Hughes Mfg. Co.,* 8 Cal.App. 559, 561 [97 P. 322]; 1 Cal.Jur. 191, sec. 48.)

Judgment affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing was denied May 20, 1943, and appellant's petition for a hearing by the Supreme Court was denied June 21, 1943.